WILLIAM A. CULPEPPER, Judge Pro Tem.
These two consolidated cases arise out of an accident in which the driver of a car went to sleep and drove into a concrete bridge abutment. Plaintiff in appeal No. 93-628 is Robert Campbell, a backseat passenger who was injured. Plaintiffs in appeal No. 93-629 are Mr. and Mrs. Eugene Frazier, Sr., parents of Robert Frazier, a front seat passenger, who died from injuries. Defendants are Richard Ledford, driver of the vehicle, and Louisiana Department of Transportation and Development (DOTD), on whose highway the accident occurred. All plaintiffs settled with Ledford. After a trial as to DOTD, the district judge held Ledford 25% at fault and DOTD 75% and awarded damages.
DOTD appeals contending the trial judge erred in: (1) finding the lack of guardrails on the bridge abutment created an unreasonable risk of harm for a motorist using reasonable care; (2) apportioning fault; and (3) awarding excessive damages.
FACTS
In the early morning hours of Sunday, January 22, 1989, Richard Ledford was driving west along Highway 6, a two lane highway between Natchitoches and Many, returning home from a fraternity party in Natchitoches. Ledford’s two passengers, Frazier and Campbell, were sleeping at the time of the accident. Both passengers had been drinking heavily at the party; however, it is undisputed that Ledford, the driver, was not intoxicated. Sometime between 4:30 and 5:00 a.m. that morning, approximately nine miles east of Many, Ledford fell asleep at the wheel of his vehicle. Ledford drifted to his right off the paved portion of the roadway before awakening and attempting to regain the roadway. Ledford testified he had difficulty steering his car back onto the roadway and was forced to turn sharply to the left. In doing so, Ledford over-corrected and crossed to the left side of the roadway where the vehicle struck the concrete abutment of the small bridge over Crib Creek. The right front portion of the car struck the abutment, demolishing the passenger side of the vehicle and killing Frazier. Campbell suffered a ruptured spleen. Ledford was not seriously injured.
The Crib Creek bridge was built in 1966 with no guardrails extending from the bridge •abutments. In 1980 and 1981, two overlay projects were conducted on Highway 6. The first overlay in 1980 covered the road be *1227 tween Many and Fort Jessup. All three bridges on this section of highway had guardrails installed during the overlay. The second in 1981 covered the road between Fort Jessup and Natchitoehes, including the bridge over Crib Creek. However, no guardrails were installed on this bridge. The parties stipulated that all fifteen bridges on Highway 6 between Natchitoches and the Texas state line have guardrails except for the Crib Creek bridge. It is also stipulated that all of these bridges received guardrails during overlay projects. It was undisputed that funds were available for guardrails at Crib Creek if they had been requested in the overlay plan.
Plaintiffs alleged that DOTD was at fault under both a negligence standard and the strict liability provided under LSA-C.C. art. 2317 and LSA-R.S. 9:2800. The trial court found the unprotected bridge abutment to be an unreasonable risk of harm and a cause-in-fact of the injuries.
FAULT OF DOTD
In the recent case of Byland v. Liberty Lloyds Ins. Co., 93-1712, p. 16 (La.1994); 630 So.2d 1289, 1300 the Louisiana Supreme Court stated the duty of DOTD as follows:
“The State, through the DOTD, is not a guarantor of the safety of travelers. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980). Rather, the duty the DOTD owes is to keep the highways and its shoulders reasonably safe. Id. The DOTD is held liable when it breaches this duty, where the roadway at the scene of the accident was in an unreasonably dangerous condition. Hunter v. Dept. of Transp. and Dev. of State of La., 620 So.2d 1149 (La.1993); Manasco v. Poplus, 530 So.2d 548 (La.1988); Myers v. State Farm Mut. Auto Ins., 493 So.2d 1170 (La.1986).”
In Vallery v. State Through Dept. of Transp., 480 So.2d 818, 822 (La.App. 3d Cir. 1985), writ denied, 481 So.2d 1350 (La.1986), we quoted the duty of DOTD as follows:
“The Department of Highways is not responsible for every accident which occurs on state highways. It is not a guarantor of the safety of travelers thereon, or an insurer against all injury or damage which may result from defects in the highways. The duty of the Department of Highways is only to see that state highways are reasonably safe for persons exercising ordinary care and reasonable prudence. It is liable for damages only when the evidence shows (1) that the hazardous condition complained of was patently or obviously dangerous to a reasonably careful and ordinarily prudent driver, and (2) that the department had notice, either actual or constructive, of the existence of the defect and failed within a reasonable time to correct it. Laborde v. Louisiana Department of Highways, 300 So.2d 579 (La. App. 3 Cir.1974); Dupre v. Louisiana Department of Highways, 154 So.2d 579 (La. App. 3 Cir.1963); Mistich v. Matthaei, 2.71 So.2d 239 (La.App. 4 Cir.1973); St. Paul v. Mackenroth, 246 La. 425, 165 So.2d 273 (1964).” Siler v. Guillotte, 410 So.2d 1265, at page 1270 (La.App. 3rd Cir.1982).”
Although DOTD argues that the scope of its duty does not extend to a motorist who falls asleep and loses control of his vehicle, our supreme court has held in a line of jurisprudence beginning with Rue v. State, Dept. of Highways, 372 So.2d 1197 (La.1979) that the department does owe a duty to a motorist who inadvertently steers his vehicle onto a road shoulder. Rue involved a dangerous rut in the shoulder which caused the motorist to lose control. See also LeBlanc v. State, 419 So.2d 853 (La.1982) which involved a four to six inch dropoff between the roadway and the shoulder. In LeBlanc, the court discusses other cases where defective shoulders caused inadvertent motorists to lose control.
In Rachal v. State, DOTD, 505 So.2d 999 (La.App. 3d Cir.), writ denied, 508 So.2d 68 (La.1987), and 508 So.2d 76 (La.1987), an intoxicated driver struck a concrete pier located within four feet of the main travelled portion of the highway. The court found DOTD 10% at fault for a hazardous condition created by the design of the highway, requir *1228 ing the driver to curve to the left and then back to the right, on a down grade within a short distance and a slope of the outside lane toward the median where the concrete pier was located underneath a railroad.
The only ease cited by counsel involving a bridge railing is Labit v. Tangipahoa Parish Council, 581 So.2d 732 (La.App. 1st Cir.), writ denied, 588 So.2d 111 (La.1991) in which a motorist on a rural parish road left the roadway and struck a bridge embankment. The railings of the wooden bridge had either been knocked down or had decayed, making it difficult to ascertain the location of the bridge or the canal. Moreover, trees obscured the vision of the motorist. The court found the parish 50% at fault. Obviously, Labit is distinguished from the present case on the facts.
In the present ease, there were no ruts, potholes or other defects either in the shoulder or the surface of the highway. The only condition which could have created an unreasonable risk of harm was the lack of guardrails on the bridge abutment which Ledford struck. As stated above, when Highway 6 between Natchitoches and Many was resurfaced with asphalt, all fifteen bridges were furnished with guardrails except this bridge over Crib Creek. The only explanation offered by DOTD is that the plans called for guardrails where the shoulders were asphalt but not where, as here, the shoulders were constructed of aggregate materials.
Plaintiffs’ expert, Larry Tipton, testified the purpose of guardrails on such concrete bridge abutments is to lessen the impact of vehicles and direct them back onto the roadway. Of course, much depends on the angle at which the vehicle strikes the guardrail. Tipton opined that in the present case the force of the impact could have been reduced as much as 80% by a guardrail.
Joseph Blasehke, the expert for DOTD, testified that it was pure speculation to estimate the degree to which the impact would have been reduced. Other experts for DOTD testified that there are over two thousand bridges in Louisiana which do not have guardrails.
In view of the peculiar circumstance that this was the only one of fifteen bridges on this particular construction project which was not furnished with guardrails, and the testimony of the experts that the severity of the impact would have been reduced to a degree, we can affirm the trial court’s finding of fact that DOTD breached its duty, and that this was a cause-in-fact of the accident and injuries.
LEDFORD’S FAULT
Ledford was a naval enlisted man stationed in Pensacola, Florida. He was on leave visiting his home in Louisiana. Led-ford left Pensacola Friday evening and arrived at his home in Many around 4:30 a.m. on Saturday morning. He slept until 7:30 a.m., when he awoke and went fishing with his father. Ledford slept again from about 1:00 p.m. until 4:30 p.m. Saturday afternoon. That evening he went to meet his friends in the local area. At some point late that evening, Ledford agreed to drive Frazier and Campbell to a party in Natchitoches. The accident occurred on their return trip early Sunday morning. Ledford admits that he went to sleep and drove onto the right-hand shoulder, then awakened and returned to the roadway, crossed both lanes of traffic and then drove onto the left-hand shoulder where he collided with the Crib Creek bridge abutment. He travelled a distance of approximately 440 feet from the time he first went on the shoulder until he struck the bridge abutment. It is obvious that Ledford was grossly negligent and that his fault was a cause of the accident and injuries.
APPORTIONMENT OF FAULT
The leading ease on the apportionment of fault is Watson v. State Farm, Fire & Cas. Ins. Co., 469 So.2d 967, 973-4 (La.1985) in which the court held as follows:
“We recognize that a standard for determining percentages of fault has not been provided by the Legislature, and we are therefore presented with an opportunity to offer guidelines as we apportion fault in *1229 this instance. In so doing we have looked to the Uniform Comparative Fault Act, 2(b) and Comment (as revised in 1979), which incorporates direction for the trier of fact. Section 2(b) provides:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.”
(Footnotes omitted.)
In the recent case of Ryland v. Liberty Lloyds Ins. Co., supra, the decedent’s vehicle was struck head on by a vehicle which plaintiffs contended was diverted and forced across the center line by cracks or holes in the pavement. The trial court and the court of appeal found the other driver 25% at fault for crossing the center line and DOTD 75% at fault for the defective condition of the roadway. The supreme court granted writs and reversed on the facts, finding there were no cracks or other defects in the roadway sufficient to divert or force the other vehicle into plaintiffs’ lane. The opinion states:
“Simply stated, plaintiffs’ evidence is legally insufficient to prove the DOTD breached its duty to keep the roadway reasonably safe for non-negligent motorists. No evidence established that either of the two holes, the one 100 feet north or the one 10 feet north of the point of impact, or any of the other roadway blemishes north of the point of impact, caused the southbound lane to be unreasonably dangerous. No evidence established that these roadway blemishes caused Flint’s vehicle to cross the center line.”
Id., 630 So.2d at 1302.
In Cay v. State Through DOTD, No. 93-0887 (La.1994); 631 So.2d 393 an intoxicated pedestrian fell off of a bridge across Little River in Catahoula Parish. Plaintiffs contended the bridge railing was too low. The trial court and the court of appeal found DOTD 60% at fault and the pedestrian 40% at fault. The supreme court amended the judgment, finding the pedestrian 90% at fault and DOTD 10% at fault. The court states:
“Cay’s voluntary intoxication and his negligence in following rules for pedestrian travel at night were significant factors in his fall. While DOTD had a duty to protect intoxicated or careless pedestrians who stumbled into the bridge railing from falling off the bridge, Cay’s fault was far greater in causing this accident. The degree of the risk created by Cay’s conduct and his far superior capacity to avoid the accident require that a much higher degree of blame be attributed to him in the causation of this accident. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985).”
Id., at p. 11; 631 So.2d at 399.
Following the analysis in Cay, Ledford’s fault in driving late at night in an exhausted condition, going to sleep at the wheel, driving onto the right shoulder, and awakening and overreacting and going onto the left shoulder where he struck the concrete bridge abutment, was far greater than the fault of DOTD in failing to erect a guardrail. The degree of risk created by Ledford’s conduct and his far superior capacity to avoid the accident requires that a much higher degree of blame be attributed to him in the causation of this accident. We conclude the trial court was manifestly erroneous in its allocation of fault. The highest degree of fault which can reasonably be apportioned to the DOTD is 10%, which means that Ledford’s fault was 90%.
QUANTUM OF DAMAGES
Wrongful Death of Robert Frazier
DOTD alleges the trial court erred in awarding $150,000 to each of Frazier’s par *1230 ents. In making this award, the trial court found:
“There is no question Mr. and Mrs. Frazier have suffered tremendously because of the loss of their son. Robert was 19 years old at the time he was killed. He was still living at home and was employed. He helped with the chores around the house and with the household expenses. Robert was a joy to his parents and family and they were proud of him.”
DOTD emphasizes Frazier was only one of ten children. It also stresses the testimony of Frazier’s father, indicating father and son did not spend much time together. While there is evidence in the record contrary to the trial court’s findings, we cannot say these findings are clearly wrong. The trial judge is in the unique position of being able to judge the demeanor and sincerity of witnesses first hand. There is not sufficient evidence for this court to hold the loss to Mr. and Mrs. Frazier was less than the trial court found it to be.
Nor can we find the award was excessive considering the circumstances of this case. We note that prior awards under similar circumstances serve as a general guide only when we have first found manifest error. The true question is whether the present award is greatly disproportionate to the mass of past awards for truly similar injuries. Reck v. Stevens, 373 So.2d 498 (La.1979). After reviewing the jurisprudence in this area, we do not find $150,000 to each parent to be an abuse of discretion. See, Cradeur v. State Through DOTD, 607 So.2d 1050 (La.App. 3d Cir.1992).
Campbell’s Injuries
Finally DOTD asserts the trial court’s award of $75,000 in general damages to Campbell was excessive. In awarding this amount, the trial court noted several factors: a ruptured spleen requiring surgery and a week’s stay in the hospital; several months recovery period; and permanent scars on the forehead, both shins and stomach. However, the record indicates Campbell made a full recovery and began naval basic training camp approximately six months after the accident.
While the cases plaintiff cites in support of the award are dissimilar since they involved residual disability, Mouton v. Southern Pacific Transp. Co., 509 So.2d 479 (La. App. 3d Cir.1987) and Seaux v. Domingue, 509 So.2d 536 (La.App. 3d Cir.), writ denied, 510 So.2d 377 (La.1987), the award is also apparently compensation for Campbell’s pain and suffering. In reviewing quantum awards, we are ever cognizant of the factfin-der’s “great, and even vast” discretion in setting damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). $75,-000 in general damages for the injuries enumerated by the trial court is undoubtedly within its vast discretion.
RELEASE OF JOINT TORTFEASOR
Jurisprudence under LSA-C.C. art. 1803 has established the rule that a plaintiffs release of a joint tortfeasor reduces the amount recoverable against the remaining tortfeasors by the amount of the virile (pro rata) share of the one released, since the plaintiff, in releasing a joint tortfeasor, has prejudiced the remaining tortfeasors by depriving them of their right of contribution from the one released. Tanner v. Fireman’s Fund Ins. Companies, 589 So.2d 507 (La. App. 1st Cir.1991), writ denied, 590 So.2d 1207 (La.1992). See also Taylor v. United States Fidelity & Guaranty Ins. Co., 93-0019, 630 So.2d 237 (La.1993). Since plaintiffs settled with Ledford prior to the trial, their recovery must be reduced by 90%. Accordingly, DOTD is liable for only 10% of the damages awarded in each case.
DECREE
For the reasons assigned, the judgments appealed are amended to reduce the liability of DOTD from 75% of the damages to 10%. Costs in the trial court and on appeal are assessed 90% to plaintiffs and 10% to DOTD.
AMENDED AND AFFIRMED.
*1231 LABORDE, J., dissents and would affirm the trial court judgment.
KNOLL, J., dissents and assigns reasons.